**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UPMC FOR YOU, INC.,
600 Grant Street, STE 55
Pittsburgh PA 15219

UPMC HEALTH COVERAGE, INC.,
600 Grant Street, STE 55
Pittsburgh PA 15219,

Plaintiffs,

v.

DEPARTMENT OF HEALTH AND HUMAN SERVICES
Hubert H. Humphrey Building
200 Independence Avenue, S.W.
Washington, D.C. 20201

CENTERS FOR MEDICARE & MEDICAID SERVICES
7500 Security Boulevard
Baltimore, MD 21244,

Defendants.

Civil Action No. 1:26-cv-4012

## COMPLAINT

Plaintiffs UPMC for You, Inc. and UPMC Health Coverage, Inc. (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this Complaint seeking relief against Defendants the United States Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS") (together, "Defendants").

In support of this Complaint, Plaintiffs allege as follows:

## INTRODUCTION

1. CMS is responsible for administering Medicare Advantage ("MA"), also known as Medicare Part C, through which private insurers provide Medicare benefits to their health plan

members pursuant to contracts the insurers hold with the United States. Insurers holding those MA contracts are referred to as Medicare Advantage Organizations, or MAOs.

2. Annually, through its Star Ratings program, CMS evaluates the quality of MA contracts and assigns a rating on a 1-to-5-star scale—a metric intended to signal coverage quality to beneficiaries. *See* 42 C.F.R. §§ 422.162(b), 422.166(h), 423.182(b), 423.186(h). These ratings carry significant reputational and financial importance to MAOs, making the program a cornerstone of MA for both plans and their members.

3. To calculate each contract's Star Rating, CMS assesses every MA contract against a uniform set of "measures" using a consistent methodology covering quality, compliance, and related metrics. The resulting ratings are intended to serve two purposes: (1) indicate coverage quality to beneficiaries; and (2) determine certain funding for MAOs—in the form of rebate retentions and Quality Bonus Payments ("QBPs")—that CMS is obligated to provide in the year following the rating year (*i.e.*, the payments lag a year behind the ratings).

4. On October 8, 2026, CMS released the "2027 Star Ratings"; those ratings in turn will dictate 2028 rebate retentions and QBPs.

5. The financial impact of Star Ratings on an MAO is enormous. QBPs and rebate retention dollars directly fund MAOs' ability to expand member benefits, lower premiums, and invest in quality improvement, ultimately shaping the competitiveness and value of the MA products available to beneficiaries.

6. Plaintiffs bring this action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, to set aside the 2027 Star Ratings calculated by CMS for two contracts: H4279 and H7123. CMS calculated those ratings using 19 measures that it adopted without adequate notice-and-comment, 42 U.S.C. § 1395hh(a)(2), and in excess of its statutory authority under 42

U.S.C. § 1395w-23(o)(4)(A). In calculating Plaintiffs' 2027 Star Ratings for the two contracts at issue in this lawsuit by incorporating these 19 unlawful measures, CMS caused Plaintiffs to lose the benefit of approximately $41 million in QBP and rebate retention over the course of 2028. These are funds that Plaintiffs could deploy to expand member benefits, lower premiums, and invest in quality improvement.

7. In bringing this action, Plaintiffs do not ask the Court to decide the legal issues on a blank slate. Recently, in *Clover Insurance Co. v. U.S. Department of Health & Human Services*, No. 2:25-cv-142, 2026 WL 1483515 (S.D. Ga. May 27, 2026), the United States District Court for the Southern District of Georgia held that CMS's use of these same measures (plus one other that has been removed for 2027 Star Ratings and is therefore not challenged here[1]) was unlawful. The court held that CMS improperly calculated Clover's 2026 Star Rating by relying on data in excess of its statutory authority and by using measures that should have been, but were not, adopted via notice-and-comment rulemaking. *Clover Ins. Co.*, 2026 WL 1483515, at *25. As a result, the *Clover* court set aside Clover's 2026 Star Rating and ordered CMS to recalculate those ratings. CMS complied.

8. Notwithstanding the *Clover* decision, and despite having effectuated the *Clover* judgment by recalculating the 2026 Star Rating for the plaintiff in that matter, CMS proceeded to incorporate the same measures into its calculation of the 2027 Star Ratings for all MAOs *except for* Clover. That is, despite the *Clover* judgment being limited to Clover's *2026* Star Rating, CMS voluntarily calculated Clover's *2027 Star Rating* by excluding the measures the *Clover* court struck down. In doing so, CMS effectively conceded the legal infirmities identified by the *Clover* court.

[1] That measure—MTM Program Completion Rate for CMR, referred to by the alphanumeric "D11" for 2026 Star Ratings purposes—was subject to a planned removal for purposes of the 2027 Star Ratings, so it is not at issue here.

It also compounded its unlawful actions both by ignoring the *Clover* precedent in calculating the 2027 Star Ratings for Plaintiffs and giving Clover special treatment for 2027.

9. CMS's use of the same measures found unlawful in *Clover* to calculate the 2027 Star Ratings is unlawful for the same two reasons articulated by the *Clover* court.

10. Furthermore, CMS's decision to exclude the measures invalidated by the *Clover* court from Clover's 2027 Star Rating while continuing to apply those same measures to Plaintiffs is arbitrary and capricious.

11. The harm to Plaintiffs is not only financial; lower Star Ratings bring significant reputational harm (which ultimately translates into declined membership). CMS publishes Star Ratings through its Plan Finder tool, directly affecting beneficiary enrollment and other consumer decisions, and contracts rated 4.0 stars or above can offer enhanced benefits funded by higher QBPs, thereby shaping competitive positioning in the MA marketplace. By incorporating unlawful measures into the 2027 Star Rating calculations, CMS cast Plaintiffs' ratings in a less favorable light in the eyes of MA consumers relative to peer MAOs that benefit from the unlawful measures, thereby undermining Plaintiffs' ability to compete for Medicare beneficiaries through enhanced benefits and the like.

12. Prior to initiating this action, Plaintiffs submitted a written request to CMS on October 22, 2026, asking CMS to treat them on equal footing as Clover, by recalculating its 2027 Star Ratings without regard to the 19 measures challenged here. CMS denied that request by written response on October 26, 2026.

13. CMS should be ordered to recalculate Plaintiffs' 2027 Star Ratings without regard to the 19 unlawful measures challenged here.

## JURISDICTION, VENUE, AND EXHAUSTION

14. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 because this action arises under the APA, 5 U.S.C. § 701 *et seq.*, and raises questions under the Medicare statute, 42 U.S.C. § 1395 *et seq*.

15. Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is an action against United States agencies.

16. On October 8, 2026, CMS published Plaintiffs' 2027 Star Ratings, which constitutes final agency action.

17. No administrative process exists through which Plaintiffs may seek reconsideration of CMS's actions.

18. Plaintiffs have standing because they offer plans whose 2027 Star Ratings were calculated using 19 measures that exceeded CMS's statutory authority. Those unlawful measures impacted Plaintiffs' ratings, inflicting substantial economic harm and placing Plaintiffs at a competitive disadvantage in the MA marketplace.

19. Plaintiffs' improperly calculated 2027 Star Ratings will inflict substantial economic harm on Plaintiffs, amounting to approximately $41 million over the course of 2028.

## PARTIES

20. UPMC for You, Inc. is a Pennsylvania nonprofit corporation with its principal place of business in Pittsburgh, Pennsylvania. UPMC Health Coverage, Inc. is a Pennsylvania nonprofit corporation with its principal place of business in Pittsburgh, Pennsylvania. Plaintiffs offer health benefit products, furnishing coverage to Medicare beneficiaries under Parts C and D, including through the following contracts:

a. Contract H4279 serves 37,434 members. It received a 2027 Star Rating of 3.5.

b. Contract H7123 serves 1,533 members. It received a 2027 Star Rating of 3.0.

21. Defendant HHS is a department of the Executive Branch of the United States government charged with overseeing the Medicare program. Its headquarters are situated at 200 Independence Ave., S.W., Washington, D.C. 20201. HHS has delegated its authority to administer the Medicare program to CMS. *See* 66 Fed. Reg. 35437 (July 5, 2001).

22. CMS is the HHS component agency primarily responsible for the administration and oversight of the Medicare program. *See id.* Its headquarters are situated at 7500 Security Blvd., Baltimore, MD 21244.

## FACTUAL ALLEGATIONS

### I. Medicare Advantage

23. Medicare is a federal health insurance program established to serve Americans aged 65 and older, as well as qualifying individuals with disabilities. *See* 42 U.S.C. § 1395 *et seq.*

24. Medicare is made up of four parts, each addressing distinct aspects of healthcare for its beneficiaries. Medicare Part A provides coverage for inpatient hospital stays, skilled nursing facilities, hospice care, and home health care. Medicare Part B provides coverage for outpatient care, physician visits, preventive services, home health care, and durable medical equipment. *See* 42 U.S.C. §§ 1395c through 1395i-6 (Part A); 42 U.S.C. §§ 1395j through 1395w-6 (Part B). Under Medicare Parts A and B—collectively known as "traditional" or "original" Medicare—the federal government acts as the insurer and directly reimburses providers for services provided to enrolled beneficiaries.

25. Alternatively, a beneficiary may elect to enroll in Medicare Part C, known since 2003 as Medicare Advantage (formerly known as "Medicare+Choice"), rather than traditional Medicare. Congress established Medicare Part C through the Balanced Budget Act of 1997. *See*

42 U.S.C. § 1395w-21 *et seq.* Through the MA program, CMS contracts with private health insurers to provide Medicare-covered benefits to enrolled beneficiaries; this shifts the financial risk of benefit delivery away from the federal government to privately operated MAOs, which receive a fixed monthly payment for each enrolled member. *See* 42 U.S.C. § 1395w-23.

26. MAOs must provide their members with no less than the same level of benefits available under traditional Medicare. MAOs integrate coverage from both Parts A and B and often offer prescription drug coverage under Part D, which was enacted in 2003 and effective in 2006 as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), Pub. L. No. 108-173, 117 Stat. 2066 (2003). *See* 42 U.S.C. § 1395 *et seq.*

27. Among other programmatic reforms, the MMA established an annual bidding process. *See id.* § 1395w-23(a)(1)(B). Each year, MAOs submit a bid by the first Monday in June projecting the cost of providing core Medicare benefits for the upcoming plan year, including overhead and profit. *See id* § 1395w-24(a)(1)(A). If the bid falls below CMS's county-level benchmark, CMS refunds a portion of the savings to the MAO as a "rebate"—dollars the MAO may direct toward supplemental benefits, premium reductions, or both. *See id.* § 1395w-23(a)(1)(E).

## II. <u>Star Ratings and their impact on MAOs</u>

### A. Medicare Star Rating calculations

28. CMS began publishing annual performance ratings for stand-alone Medicare Prescription Drug Plans in 2007. In 2008, CMS "introduced and displayed the Star Ratings for Medicare Advantage Organizations . . . for both Part C only contracts . . . and Part C and D contracts (MA-PDs). Each year since 2008, [CMS has] released the MA Star Ratings [subsequently adding] [a]n overall rating combining health and drug plan measures" in 2011. 83 Fed. Reg. 16440, 16520 (April 16, 2018) (Final Rule).

29. Even a decade before the launch of the Star Ratings program, however, MAOs were obligated to maintain "an ongoing quality assurance program" for the healthcare services provided to their members. Pub. L. No. 105-33, § 4001, 111 Stat. 251, 291 (1997) (codified at 42 U.S.C. § 1395w-22(e)(1)). Congress expressly conferred upon CMS the authority to select the "quality and outcomes measures" that the Secretary "determine[d] to be appropriate" as components of plans' quality assurance programs. 42 U.S.C. §§ 1395w-22(e)(1), (e)(2)(A)(xii) (1997). That discretion created uncertainty and confusion, as CMS proposed various quality measures and practice standards without constraint.

30. In 2003, Congress eliminated this uncertainty by codifying CMS's quality measures into statute. *See* MMA, Pub. L. No. 108-173, 117 Stat. 2066 (2003). These amendments limited CMS to requiring quality-measure data that were "the types of data that were collected by the Secretary as of November 1, 2003," allowing departure from those data types only after submitting a report to Congress. 42 U.S.C. § 1395w-22(e)(3)(B).

31. In 2004, CMS recognized it was limited under § 1395w-22(e), and, from then on, it would rely exclusively on its pre-existing, pre-2003 measurement systems addressing clinical quality, health outcomes, and beneficiary satisfaction: the Healthcare Effectiveness Data and Information Set ("HEDIS"), Health Outcomes Survey ("HOS"), and Consumer Assessment of Healthcare Providers and Systems ("CAHPS"). *See* 69 Fed. Reg. 46,866, 46,886 (Aug. 3, 2004) ("We interpret section 1852(e)(3)(B)(i) of the Act to mean that we can continue to require MA coordinated care plans to collect, analyze, and report their performance by using the measurement systems that are currently required, such as HEDIS, Health Outcomes of Seniors (HOS), and CAHPS, as appropriate for the type of plan.").

32. CMS inaugurated its Star Ratings system in 2007. In 2010, the Patient Protection

and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010), introduced the Quality Bonus Payment program and adopted the Star Ratings system as its implementing mechanism. Congress identified § 1395w-22(e) as the sole source of data for quality rating calculations, omitting the clause that had previously afforded the Secretary discretion to consider other measures. *See* 42 U.S.C. § 1395w-23(o)(4)(A).

33. Each contract's overall Star Rating is a composite score ranging from 1 to 5 stars, including half-stars, obtained by evaluating the contract's performance on "measures" announced by CMS. Different measures carry different weight (assigned by CMS), and combined they produce the contract's single summary rating. CMS publishes its Star Rating methodology in annual sub-regulatory guidance documents called "Technical Notes," which set forth the applicable measures and other key data used to assign measure-level scores. CMS revises these Technical Notes, and the measures they describe, outside of notice-and-comment rulemaking.

34. Because the overall Star Rating is a weighted average, performance on any single measure—particularly a heavily weighted one—can push a contract above or below a critical threshold. Contracts that attain the critical threshold score of 4.0 or better qualify for a QBP.

35. Thus, today, the Medicare "Star Ratings" program serves two purposes: it is CMS's main vehicle for evaluating and publicizing MAO care quality while also embodying the financial incentive structure Congress designed to encourage quality-driven competition among MAOs.

**B. Rebate retentions and the Quality Bonus Payment**

36. Under the MA program, MAOs submit bids to CMS in early June of the year preceding the contract year (*e.g.*, bids for MA contract year 2028 will be due to CMS in June 2027). MAOs whose bids fall below the applicable benchmark receive a "rebate" from CMS, which they may utilize to enhance benefits, reduce cost-sharing, or lower premiums.

37. The amount of that rebate an MAO retains depends directly on its Star Rating. Contracts rated below 3.5 stars (including unrated or new plans) retain 50% of the rebate amount. Contracts achieving a rating of at least 3.5 but below 4.5 stars retain 65%. Contracts attaining the highest tier of 4.5 stars or above retain the maximum 70% of the rebate. This framework thereby rewards higher-quality contracts with greater financial flexibility. This tiered structure means that a contract's Star Rating carries significant downstream effects not only for its QBPs but also for its capacity to fund improved benefit designs and maintain competitiveness in the marketplace.

38. Pursuant to 42 U.S.C. § 1395w-23(o), CMS remits a QBP to MAOs whose contracts achieve a Star Rating of 4.0 or above. The QBP takes the form of an elevated benchmark—the maximum per-member amount CMS will pay—which in turn enables the MAO to offer enhanced supplemental benefits and return excess payments to enrollees as rebates.

39. For MAOs like Plaintiffs, the difference of even a half-star (especially one falling below 4.0) can amount to tens of millions of dollars in lost annual rebates and bonus payments and in diminished member benefits.

**C. The Medicare Advantage cycle**

40. An MA contract's Star Rating for a given year determines its rebate retention and QBP, if any, for the following contract year. Those anticipated rebates and QBP are factored into the bids MAOs submit to CMS the preceding June.

41. Relevant here, CMS released the 2027 Star Ratings for Plaintiffs' (and all other MAO) contracts on October 8, 2026. Those 2027 Star Ratings determine Plaintiffs' rebate retentions and QBP for use in MA contract year 2028. The bids for the 2028 contracts are due to CMS in June 2027.

42. The following details the typical schedule of key Medicare Star Ratings events for

the 2027 Star Ratings:

| **2027 Star Ratings – Key Periods and Events** | |
|---|---|
| Calendar Year 2025 | Measurement period for the performance data that serve as a baseline for Plaintiffs' 2027 Star Ratings |
| June 1, 2026 | Statutory bid deadline for 2027, factoring in anticipated 2027 rebate retentions and QBP based on 2026 Star Ratings |
| Aug. 5, 2026 – Aug. 12, 2026 | Plan Preview 1 for 2027 Star Ratings |
| Sept. 8, 2026 – Sept. 15, 2026 | Plan Preview 2 for 2027 Star Ratings |
| Oct. 8, 2026 | 2027 Star Ratings Published |
| Oct. 15, 2026 | Annual Election Period commences |
| Jan. 1, 2027 | MA Open Enrollment commences |
| June 7, 2027 | Statutory bid deadline for 2028, factoring in anticipated 2028 rebate retentions and QBP based on 2027 Star Ratings |
| 2028 | QBPs stemming from 2027 Star Ratings paid |

## III. The *Clover* decision

43. On November 7, 2025, Clover Insurance Company filed suit in the United States District Court for the Southern District of Georgia challenging its 2026 Star Rating on the ground that CMS had unlawfully adopted certain measures used in its calculation. *See generally Clover Ins. Co.*, 2026 WL 1483515.

44. In an order entered on May 27, 2026, the court held that 20 measures on which CMS relied in calculating the 2026 Star Ratings were unlawful. Specifically, the *Clover* court held that the Medicare statute, 42 U.S.C. § 1395w-23(o)(4)(A), prohibits CMS from incorporating Star

Ratings measures derived from data collected outside the data sources authorized by § 1395w-22(e), and that ten measures challenged by the Clover Insurance Company ("Clover") ran afoul of that statutory limitation. *Id.* at *14. The court also held that CMS's utilization of ten other measures challenged by Clover was procedurally improper because those ten measures were not adopted pursuant to public notice and comment as required by another section of the Medicare statute, 42 U.S.C. § 1395hh(a)(2). *Id.* at *25. CMS thus could not properly rely on those measures when calculating the 2026 Star Rating for Clover. The court vacated Clover's 2026 Star Rating and directed CMS to recalculate it consistent with its holdings.

45. The following chart identifies the measures the court in *Clover* found unlawful, along with the bases for the court's decision:

| | |
|---|---|
| Measures Based on Non-§ 1395w-22(e) Data Sources | • C32 (Reviewing Appeals Decisions);<br>• C33 (Call Center – Foreign Language Interpreter and TTY Availability);<br>• D01 (Call Center – Foreign Language Interpreter and TTY Availability);<br>• D05 (Rating of a Drug Plan);<br>• D06 (Getting Needed Prescription Drugs);<br>• D08 (Medication Adherence for Diabetes Medications);<br>• D09 (Medication Adherence for Hypertension (RAS antagonists));<br>• D10 (Medication Adherence for Cholesterol (Statins));<br>• D11 (MTM Program Completion Rate for CMR); and<br>• D12 (Statin Use in Persons with Diabetes). |
| Measures Established or Materially Changed Without Notice-and-Comment Rulemaking | • C03 (Annual Flu Vaccine);<br>• C04 (Improving or Maintaining Physical Health);<br>• C05 (Improving or Maintaining Mental Health);<br>• C15 (Reducing the Risk of Falling);<br>• C16 (Improving Bladder Control);<br>• C22 (Getting Needed Care);<br>• C23 (Getting Appointments and Care Quickly);<br>• C24 (Customer Service);<br>• C25 (Rating of Health Care Quality); and<br>• C27 (Care Coordination). |

46. CMS did not immediately appeal the *Clover* decision and seek a stay. Instead,

within two weeks of the order, CMS complied with it by recalculating Clover's 2026 Star Rating as ordered by the court.

47. More than 50 days later, on July 21, 2026, CMS filed a notice of appeal to the United States Court of Appeals for the Eleventh Circuit. *See Clover Ins. Co. v. DHHS*, No. 2:25-cv-00142 (S.D. Ga.), Notice of Appeal, ECF No. 67 (July 21, 2026). CMS subsequently requested expedited briefing, which the court granted. *See Clover Ins. Co. v. DHHS*, No. 26-12553 (11th Cir.), Mot. to Restart or Set Briefing Schedule and to Expedite Oral Argument, ECF No. 13 (Aug. 19, 2026); *Clover Ins. Co. v. DHHS*, No. 26-12553 (11th Cir.), Order, ECF No. 15-1 (Sept. 2, 2026). Argument has been scheduled for January 21, 2027. *Clover Ins. Co. v. DHHS*, No. 26-12553 (11th Cir.), Oral Argument Calendar, at 1 (Nov. 6, 2026).

## IV. Plaintiffs' 2027 Star Ratings

### A. Publication of 2027 Star Ratings in October 2026

48. On October 8, 2026, CMS published the 2027 Star Ratings. With respect to Plaintiffs, CMS assigned an overall 2027 Star Rating of 3 stars to Contract H7123 and 3.5 stars to Contract H4279. These ratings fell below the 4-Star threshold governing QBP eligibility under 42 U.S.C. § 1395w-23(o). Additionally, both contracts would have qualified for higher rebate retention tiers absent the inclusion of the unlawful measures.

49. CMS also published Plaintiffs' measure-level 2027 Star Ratings on its website, rendering both the overall and measure-specific ratings visible to Medicare beneficiaries, brokers, and the general public through the Plan Finder tool.

50. Notwithstanding the *Clover* decision and CMS's implementation of it for Clover, CMS used the same measures (subject to several administrative modifications that do not carry

legal importance[2]) to calculate the 2027 Star Ratings. The 19 measures challenged in this Complaint are among the 20 which the *Clover* court held unlawful. (The one other measure addressed in *Clover* was removed from use for purposes of the 2027 Star Ratings and is thus not at issue here. *See supra* n.1.)

51. The one exception for 2027 was Clover. For Clover's 2027 Star Rating, but no other MAO's 2027 Star Rating, CMS again removed the measures held unlawful in *Clover* despite no legal requirement to do so: the *Clover* lawsuit—and the *Clover* court's order—only addressed Clover's 2026 Star Rating. The *Clover* order could not possibly have addressed Clover's 2027 Star Rating because CMS only announced the 2027 Star Ratings on October 8, 2026—well after the court's order was published on May 27, 2026. CMS removed those measures voluntarily and only for Clover. It did not offer similarly situated MAOs, like Plaintiffs, the same treatment.

52. CMS's legal authority with respect to the Star Ratings program has not been expanded by Congress in the past year; no development has occurred that renders CMS's reliance on the same measures held unlawful in *Clover* any more lawful for purposes of calculating the 2027 Star Ratings. And there is no justification for CMS calculating Clover's 2027 Star Rating under one set of measures while calculating Plaintiffs' 2027 Star Ratings under another.

---

[2] In addition to CMS removing the measure "MTM Program Completion Rate for CMR" for the 2027 Star Ratings, *see supra* n.1, it redesignated the alpha-numeric symbols for each of the following measures: "Call Center – Foreign Language Interpreter and TTY Availability" from "C33" to "C32"; "Care Coordination" from "C27" to "C26"; "Customer Service" from "C24" to "C23"; "Getting Appointments and Care Quickly" from "C23" to "C22"; "Getting Needed Care" from "C22" to "C21"; "Rating of Health Care Quality" from "C25" to "C24"; "Reviewing Appeals Decisions" from "C32" to "C31"; and "Statin Use in Persons with Diabetes (SUPD)" from "D12" to "D11." The substance and significance of these measures are unchanged.

**B. The impact of the 19 unlawful measures in the 2027 Star Rating on Plaintiffs' contracts**

53. Absent the 19 unlawful measures, Plaintiffs anticipate that Contract H7123 would have received an overall 2027 Star Rating of 3.5, and that Contract H4279 would have received an overall 2027 Star Rating of 4.0.

54. The financial consequence of CMS's action with respect to the 2027 Star Ratings is substantial, totaling approximately $41 million in lower or lost rebates and QBPs over the course of 2028. These are resources that Plaintiffs could direct toward supplemental benefits, premium reductions, and quality improvement initiatives for their members.

**C. Reputational harm caused by the publication of unlawfully derived 2027 Star Ratings**

55. In addition to the financial consequences, CMS's publication of the 2027 Star Ratings has caused, and continues to cause, reputational harm to Plaintiffs. Star Ratings are publicly available on CMS's Medicare Plan Finder tool, where current and prospective Medicare beneficiaries regularly consult them when making enrollment decisions. A depressed Star Rating (particularly one that falls below the 4.0-Star threshold) signals to members and the market that an MAO's quality of care is substandard, regardless of whether that rating accurately reflects the MAO's actual performance. At the same time, because Star Ratings are relative, competitor MAO ratings may be artificially inflated by the 19 unlawful measures, further distorting how Plaintiffs' plans are perceived and casting them in a less favorable light.

56. The reputational implications of a below-threshold Star Rating extend beyond any individual enrollment cycle. Brokers and third-party marketing organizations that direct Medicare beneficiaries toward specific plans may deprioritize or refuse to market plans rated below 4.0 stars, reducing Plaintiffs' visibility and competitiveness in the marketplace. Employers and plan sponsors that offer MA options to retirees may similarly rely on Star Ratings as a proxy for plan

quality, and a suppressed rating diminishes Plaintiffs' ability to compete for and retain those relationships.

## CLAIMS FOR RELIEF

### COUNT I: AGENCY ACTION TAKEN WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW—2027 STAR RATINGS (5 U.S.C. § 706(2)(D))

57. Plaintiffs incorporate by reference paragraphs 1 through 56 above as though fully set forth herein.

58. Under 5 U.S.C. § 706(2)(D), an agency may not act without observance of procedure required by law.

59. Congress has mandated that CMS engage in notice-and-comment rulemaking and codify "by regulation" any "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under [Medicare]." *Azar v. Allina Health Servs.*, 587 U.S. 566, 570 (2019) (quoting 42 U.S.C. § 1395hh(a)(2)).

60. Moreover, by its own regulation, CMS is obligated to adopt new quality measures through notice-and-comment rulemaking. *See* 42 C.F.R. § 422.164(c)(2) ("In advance of the measurement period, CMS will announce potential new measures and solicit feedback through the process described for changes in and adoption of payment and risk adjustment policies in section 1853(b) of the Act and then subsequently will propose and finalize new measures through rulemaking."). *See also id.* § 422.164(d) (requiring notice-and-comment rulemaking for substantive updates to existing measures); *id.* § 423.184(c), (d) (requiring same for Part D measures).

61. CMS failed to undertake the required notice-and-comment rulemaking and codify "by regulation" all 19 measures challenged in this lawsuit in calculating Plaintiffs' 2027 Star Ratings: C03, C04, C05, C15, C16, C21, C22, C23, C24, C26, C31, C32, D01, D05, D06, D08, D09, D10, and D11. Each of these measures establishes a substantive legal standard governing Plaintiffs' QBP eligibility—and therefore governing "the payment for services" within the meaning of 42 U.S.C. § 1395hh(a)(2)—yet none was promulgated by regulation.

62. Because CMS calculated the 2027 Star Ratings for Contracts H4279 and H7123 using measures adopted without observance of procedure required by law (*i.e.*, notice and comment), the Court should vacate the 2027 Star Ratings for those two contracts and direct CMS to recalculate their Star Ratings without regard to these 19 measures.

**COUNT II: AGENCY ACTION NOT IN ACCORDANCE WITH LAW, IN VIOLATION OF STATUTORY RIGHT, IN EXCESS OF STATUTORY AUTHORITY—2027 STAR RATINGS (5 U.S.C. § 706(2)(A), (C))**

63. Plaintiffs incorporate by reference paragraphs 1 through 56 above as though fully set forth herein.

64. Congress restricted the data upon which CMS's Star Ratings may be based to data for which an MAO provides for the collection, analysis, or reporting as part of its quality improvement program. 42 U.S.C. § 1395w-23(o)(4)(A) (requiring Star Ratings to be based on "data collected under section 1395w-22(e) of this title").

65. CMS calculated the 2027 Star Ratings for Contracts H4279 and H7123 using measures that are based on data not collected under § 1395w-22(e). Specifically, nine of the measures challenged in this Complaint (C31, C32, D01, D05, D06, D08, D09, D10, and D11) were calculated utilizing data generated outside the scope of what CMS is permitted to use under § 1395w-22(e) to calculate Star Ratings.

66. Because CMS calculated Plaintiffs' 2027 Star Ratings for Contracts H4279 and H7123 using data not collected under § 1395w-22(e), the Court should vacate the unlawful 2027 Star Ratings for those contracts and direct CMS to recalculate those Star Ratings without regard to these nine measures.

**COUNT III: ARBITRARY AND CAPRICIOUS AGENCY ACTION**
**(5 U.S.C. § 706(2)(A))**

67. Plaintiffs incorporate by reference paragraphs 1 through 56 above as though fully set forth herein.

68. Under 5 U.S.C. § 706(2)(A), the Court must hold unlawful and set aside agency action that is arbitrary or capricious, *inter alia*.

69. "[T]he great principle that like cases must receive like treatment is . . . black letter administrative law." *Grayscale Invs., LLC* v. SEC, 82 F.4th 1239, 1245 (D.C. Cir. 2023) (citation omitted). An agency's failure to abide by this principle is arbitrary and capricious.

70. In calculating the 2027 Star Rating for Clover, CMS did not use the 19 measures challenged in this lawsuit. And yet, for Plaintiffs, it did. Plaintiffs asked CMS to treat them the same as Clover, but that request was denied. There is no justification for this unequal treatment: even if the *Clover* decision might have given CMS a basis to treat Clover differently for purposes of its 2026 Star Rating, that lawsuit—and the court's judgment in Clover's favor—addressed only Clover's 2026 Star Rating. There was no justifiable basis for CMS to treat Clover uniquely for purposes of its 2027 Star Rating. CMS's voluntary decision to grant Clover special treatment not offered to other MAOs, including Plaintiffs, in calculating its 2027 Star Rating is arbitrary and capricious. See *Westar Energy v. Federal Energy Regulatory Comm'n*, 473 F.3d 1239, 1241 (D.C. Cir. 2007) (noting that "[a] fundamental norm of administrative procedure requires an agency to treat like cases alike. If the agency makes an exception in one case, then it must either make an

exception in a similar case or point to a relevant distinction between the two cases.").

71. Because CMS's unequal treatment of Plaintiffs and Clover in relation to the calculation of their respective 2027 Star Ratings was arbitrary and capricious, the Court should set aside the 2027 Star Ratings for Contracts H4279 and H7123, and order CMS to recalculate them without regard to the 19 measures challenged in this lawsuit.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and:

a) Declare that measures C03, C04, C05, C15, C16, C21, C22, C23, C24, C26, C31, C32, D01, D05, D06, D08, D09, D10, and D11, were adopted by CMS without observance of procedure required by law because CMS failed to adopt those measures through public notice and comment;

b) Declare that measures C31, C32, D01, D05, D06, D08, D09, D10, and D11 were adopted in excess of CMS's statutory authority because those measures were not derived from data collected under 42 U.S.C. § 1395w-22(e), as required by 42 U.S.C. § 1395w-23(o)(4)(A);

c) Declare that in failing to calculate Plaintiffs' 2027 Star Ratings for Contracts H4279 and H7123 in a manner consistent with how it calculated the 2027 Star Rating for Clover, CMS acted in an arbitrary and capricious manner;

d) Vacate the 2027 Star Ratings for Contracts H4279 and H7123 and order CMS to recalculate the 2027 Star Rating for each contract without regard to the 19 unlawful measures identified in this Complaint;

e) Direct CMS to determine all 2028 QBPs and rebates for Contracts H4279 and H7123 consistent with the recalculated Star Ratings;

f) Order CMS to permit Plaintiffs to revise any previously submitted MA bid(s)

necessary to effectuate the judgment, consistent with this Court's order, the recalculated Star Ratings, and the revised QBPs and rebates; and

g) Award Plaintiffs such other and further relief as the Court may deem just and proper, including costs and fees, as permitted by law.

*[Signature Page Follows]*

Dated: November 13, 2026

/s/ Daniel W. Wolff
Daniel W. Wolff
DWolff@crowell.com
D.C. Bar No. 486733
**Crowell & Moring LLP**
600 Fifth Street, N.W.
Washington, DC 20001
Telephone: (202) 624-2621

Steven D. Hamilton (*pro hac vice* forthcoming)
StevenHamilton@crowell.com
Illinois Bar No. 6289663
**Crowell & Moring LLP**
300 N. LaSalle Drive, Suite 2500
Chicago, IL 60654
Telephone: (312) 379-7615

*Counsel for Plaintiffs*